## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| DONNA JONES, as personal representative of the estate of Jessica Jordan, | * * * | |
| Plaintiff, | * * | Civil Action No.: |
| v. | * * * | |
| HEATHER LYNN MATTOX, WILLIE BLAKE HARRY, JENNIFER CARSON, TIFFANY GASPARD, OFC. JUSTINA MACKEY, CHRISTIE BOLT, and JONATHAN STRICKLAND, and SOUTHERN HEALTH PARTNERS, INC. | * * * * * * * | **Jury Trial Demanded** |
| Defendants. | * | |

## COMPLAINT FOR DAMAGES

DONNA JONES, as personal representative of the estate of JESSICA JORDAN, ("Plaintiff"), files this Complaint for Damages against Defendants Heather Lynn Mattox, Willie Blake Harry, Jennifer Carson, Tiffany Gaspard, Justina Mackey, Christie Bolt, Jonathan Strickland, (collectively as "individual Defendants"), and Southern Health Partners, Inc., ("Defendant SHP"), showing this Honorable Court the following:

## INTRODUCTION

1.

This is a 42 U.S.C. §1983 federal civil rights action and state law medical malpractice action arising from the death of Jessica Jordan ("Jessica") in the Randolph County Jail. Plaintiff contends that jail's contract medical provider, Defendant SHP and its employees, including Defendant Heather Lynn Mattox, were negligent in their care of Jessica, and were deliberately indifferent to her health and safety and her serious medical needs, after Jessica reported that she had ingested eight grams of methamphetamine ("meth"). Plaintiff also contends that Randolph County deputy

sheriffs and jailers were deliberately indifferent to Jessica's serious medical needs by failing to transport her to a hospital for evaluation and treatment. The actions and omissions of Defendants as described below were direct and proximate causes of Jessica's untimely death, for which Defendants are liable for Jessica's wrongful death and seeks all damages allowed pursuant to 42 U.S.C. § 1983 and Alabama Code § 6-5-410.

## JURISDICTION AND VENUE

2.

This action is brought pursuant to 42 U.S.C. §§1983 and 1988, as well as the Fourteenth Amendment of the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §1331, §1343, and the above referenced constitutional and statutory provisions. Plaintiff further invokes the pendant or supplemental jurisdiction of this Court to decide claims arising under state law pursuant to 28 U.S.C. §1367.

## PARTIES

3.

Plaintiff Donna Jones ("Plaintiff") is a resident of Alabama. She is the mother of Jessica Jordan and representative of her estate.

4.

Defendant Heather Lynn Mattox ("Defendant MATTOX"), sued in her individual capacity, is a resident of Alabama and is subject to the personal jurisdiction of this Court.

5.

At all times relevant to this action, Defendant MATTOX was operating under the color of state law and as a jail nurse employed by Defendant Southern Health Partners.

6.

Defendant Willie Blake Harry ("Defendant HARRY"), sued in his individual capacity, is a resident of Alabama and is subject to the personal jurisdiction of this Court.

7.

At all times relevant to this action, Defendant HARRY was acting under the color of state law and as a correctional officer employed by the Randolph County Jail.

8.

Defendant Jennifer Carson ("Defendant CARSON"), sued in her individual capacity, is a resident of Alabama and is subject to the personal jurisdiction of this Court.

9.

At all times relevant to this action, Defendant CARSON was acting under the color of state law and as a correctional officer employed by Randolph County Jail.

10.

Defendant Tiffany Gaspard ("Defendant GASPARD"), sued in her individual capacity, is a resident of Alabama and is subject to the personal jurisdiction of this Court.

11.

At all times relevant to this action, Defendant GASPARD was acting under the color of state law and as a correctional officer employed by Randolph County Jail.

12.

Defendant Justina Mackey ("Defendant MACKEY"), sued in her individual capacity, is a resident of Alabama and is subject to the personal jurisdiction of this Court.

13.

At all times relevant to this action, Defendant MACKEY was acting under the color of state law and as a correctional officer employed by the Randolph County Jail.

14.

Defendant Christie Bolt ("Defendant BOLT"), sued in her individual capacity, is a resident of Alabama and is subject to the personal jurisdiction of this Court.

15.

At all times relevant to this action, Defendant BOLT was acting under the color of state law and as a correctional officer employed by the Randolph County Jail.

16.

Defendant Jonathan Strickland ("Defendant STRICKLAND"), sued in his individual capacity, is a resident of Alabama and is subject to the personal jurisdiction of this Court.

17.

At all times relevant to this action, Defendant STRICKLAND was acting under the color of state law and as the Administrator of the Randolph County Jail.

18.

Defendant Southern Health Partners, Inc., ("Defendant SHP"), is a private for-profit corporation that is under a contractual obligation to provide medical care for inmates in the Randolph County Jail.

19.

At all times relevant to this action, Defendant SHP was the on-site medical provider at the Randolph County jail and employed Defendant MATTOX as a nurse in this capacity.

20.

Defendants are joint tortfeasors whose actions separately and in combination jointly and cumulatively, were the direct and proximate cause of Jessica's death.

21.

All Defendants are subject to the jurisdiction and venue in this District.

## FACTUAL ALLEGATIONS

22.

On November 25, 2023, while detained at the Randolph County Jail, Jessica was found unresponsive in her cell and was later pronounced deceased.

23.

At the request of Randolph County Sheriff's Department Sheriff David Cofield, the events surrounding Jessica's death were investigated by the Alabama Law Enforcement Agency (ALEA) State Bureau of Investigation (SBI). [1]

24.

The facts stated herein are based on investigative interviews and findings obtained by the SBI relating to the events and circumstances leading to Jessica's death.

25.

Special Agent Senior (SAS) Chris Lampley responded to the scene at the Randolph County Jail, located at 340 Probuilt Drive, Wedowee, Alabama.

---

[1] The SBI's Final Summary relating to its investigation into the death of Jessica Jordan, Pages 1-15, is attached hereto as **Exhibit 1**.  The Exhibit List of evidence obtained and reviewed by the SBI as part of its investigation into the death of Jessica Jordan, Pages 1-5, is attached hereto as **Exhibit 2**. Statements of individual Defendants obtained by the SBI are attached hereto as **Exhibit 3**.

26.

SAS Lampley learned that Jessica informed correctional officials at the jail that she consumed eight grams of meth that she had hidden inside her vagina.

27.

Following her report of having consumed eight grams of meth, jail officials reported to the SBI that Jessica was placed in a safety chair for her safety.

28.

At some point after being placed into the safety chair, Jessica was found unresponsive and was treated by the jail staff until Southern Ambulance Transport arrived on scene.

29.

Once at the jail, Southern Ambulance Transport provided medical aid to Jessica and transported her to Tanner Medical Center/East, where Jessica was examined and pronounced deceased.

30.

Upon arrival at the jail, SAS Lampley entered the jail cell and took photographs of the cell and was informed that Jessica had been the only one in the jail cell.

31.

SAS Lampley retrieved video surveillance from the area of the jail where Jessica's cell was located and then traveled to Tanner Medical Center/East where he photographed Jessica's body.

32.

At the time of her death Jessica was 32 years old with a height of 5'3" and weight of 147 pounds.

33.

SAS Lampley reviewed jail camera footage of the incident and determined the following.

34.

On November 25, 2023, at approximately 1:00 pm, work detail personnel stood around conversing while jail officers walked back and forth to the central office, and Defendant MACKEY can be seen pushing a cart with inmates' food trays.

35.

On November 25, 2023, at approximately 2:56 pm, Defendant MACKEY entered Jessica's cell and took her vitals; and at approximately 3:03 pm, Defendant MACKEY exited Jessica's cell, while Jessica appeared asleep in the bed with a safety helmet on her head.

36.

At approximately 3:48 pm, Jessica got out of bed, took off the safety helmet, walked over to the sink, and filled a cup with water.

37.

Jessica sat on the toilet with her back to the camera and is seen taking something from a white pill bottle and drinking water after putting something in her mouth.

38.

Jessica stood up over the sink and appeared to be rinsing the pill bottle with water and then footage shows her flushing the pill bottle in the toilet, and then she bangs and kicks the door trying to get the correction officers' attention.

39.

At approximately 4:00 pm, Jessica laid on her back inside cell H2 kicking the door.

40.

Defendants HARRY and GASPARD enter Jessica's cell, where Defendant HARRY sits Jessica up while Defendant GASPARD gives Jessica a cup of water, and then puts the safety helmet back on Jessica's head.

41.

At approximately 4:24 pm, Defendants HARRY and GASPARD helped Jessica into a safety chair and strapped down her arms and legs.

42.

At approximately 4:29 pm, Defendants HARRY and GASPARD exit Jessica's cell.

43.

At approximately 4:40 pm, Defendants HARRY and MACKEY entered Inmate JORDAN's cell, where Defendant HARRY put straps back on Jessica's legs, and Defendant MACKEY checked Jessica's vitals.

44.

At approximately 4:52 pm, Defendants HARRY and MACKEY exited Jessica's cell with her remaining in the safety chair.

45.

At approximately 5:04 pm, Defendant MACKEY entered Jessica's cell with a food tray and spoke to her.

46.

At approximately 5:06 pm, Defendant MACKEY exited Jessica's cell.

47.

At approximately 5:10 pm, Defendants MACKEY and HARRY entered Jessica's cell, spoke to her, and Defendant HARRY searched Jessica's cell for any sign of drugs.

48.

At approximately 5:18 pm, Defendants HARRY and MACKEY exited Jessica's cell.

49.

At approximately 6:27 pm, Defendants BOLT and CARSON entered Jessica's cell, and Defendant BOLT called Jessica's name several times with no answer and then observed white foam coming from Jessica's mouth.

50.

Defendants BOLT and CARSON notified the jail's central office to call 911 because Jessica was unresponsive.

51.

 At approximately 6:29 pm, Defendants BOLT started CPR on Jessica in the safety chair and then placed Jessica on the floor and CPR continued.

52.

Defendant BOLT retrieved an Automated External Defibrillator (AED) and placed it on Jessica and Defendant CARSON continued CPR.

53.

At approximately 6:40 pm, Randolph County Deputy Sheriff Jessie Elliot arrived at Jessica's cell and took over CPR.

54.

At approximately 6:44 pm, Southern Ambulance Transport Rescue entered Jessica's cell and provided aid.

55.

Southern Ambulance Transport Rescue transported Jessica to Tanner Medical Center/East Alabama.

56.

SAS Lampley reviewed Defendant GASPARD's body camera footage of the incident and determined the following:

57.

On November 25, 2023, at an unknown time due to Defendant GASPARD'S body worn camera time not being correct, Defendants GASPARD and HARRY enter Jessica's jail cell and spoke to her about swallowing drugs.

58.

Defendant HARRY notified central office to inform them of what Jessica told Defendants HARRY and GASPARD, specifically that she had the drugs hidden inside her vagina.

59.

Defendant HARRY asked central office to notify the nurse.

60.

Defendant HARRY told Jessica that Defendants HARRY and GASPARD were waiting on the nurse to call back because they did not know what to do.

61.

Defendant MACKEY told Defendant HARRY that she had called the nurse four times without a response, so Defendant MACKEY called Randolph County Jail Administrator, Defendant STRICKLAND.

62.

Defendant MACKEY informed Defendant HARRY that Defendant STRICKLAND informed Defendants GASPARD and HARRY to put Jessica in a safety helmet and safety chair to prevent her from hurting herself if she had another seizure.

63.

On November 30, 2023, SAS Lampley reviewed Defendant BOLT's body camera footage of the incident and determined the following.

64.

On November 25, 2023, at approximately 6:27 pm, Defendant BOLT told Defendant CARSON to notify the central office to call paramedics.

65.

Defendant BOLT started chest compressions as Defendant CARSON removed the leg and arm straps that were placed on Jessica.

66.

Defendants BOLT and CARSON placed Jessica on the floor and continued performing CPR.

67.

Defendant BOLT retrieved the AED and placed it on Jessica as Defendant CARSON continued to administer CPR.

68.

Defendant BOLT searched for Narcan in a red medical bag but was unable to locate it. Paramedics arrived and provided medical aid before transporting Jessica to Tanner Medical Center/East Alabama.

69.

SAS Lampley reviewed body camera footage of Wedowee Police Officer Roy Brown from the hospital after Jessica had been transported there for treatment and determined the following, as set forth in paragraphs 70-71.

70.

On November 25, 2023, at approximately 7:07 pm, Officer Brown drove his patrol vehicle enroute to the hospital to check on Jessica.

71.

Officer Brown walked into the emergency room and observed Jessica being treated by medical staff, and then Officer Brown called his supervisor to inform him that he had arrested Jessica on November 22, 2023, on two felony charges and one misdemeanor.

72.

SAS Lampley obtained a recorded statement from Defendant MATTOX, an LPN employed by Defendant SHP at the Randolph County Jail, who stated that on November 25, 2023, at approximately 4:35 pm, Defendant MACKEY called her regarding Jessica and told her that Jessica had informed jail staff that she had swallowed "meth."

73.

Defendant MATTOX told Defendant MACKEY that Jessica was arrested on Wednesday, November 22, 2023, and that she saw Jessica that morning and now she was saying she had drugs on her person all that time.

74.

Defendant MATTOX stated that she asked Defendant MACKEY how that was feasible, and Defendant MACKEY told Defendant MATTOX that Jessica told Defendants GASPARD and HARRY that she hid the drugs inside her vagina.

75.

Defendant MATTOX stated that she advised the jail staff to check on Jessica every fifteen minutes and monitor her vitals every hour and if anything changed, to call her back.

76.

Defendant MATTOX stated that she had been called earlier that day about Jessica having a seizure.

77.

Defendant MATTOX stated that at approximately 6:40 pm, Defendant BOLT called her back asking where the Narcan was located.

78.

Defendant MATTOX stated that she could tell Defendant BOLT sounded panicked, and that she told Defendant BOLT that the Narcan was inside the red bag in the medical room.

79.

Defendant MATTOX stated that Defendant BOLT did not know what Narcan looked like because the box had Naloxone on the outside.

13

80.

Defendant MATTOX stated that was the last time she heard from anyone at the jail until Randolph County Jail Correctional Officer Alexis Bledsoe called her back and told her Jessica was being transported to the hospital, and she did not look good.

81.

Defendant MATTOX stated that no one ever told her that Jessica had taken eight grams of methamphetamine otherwise, she would have handled the situation differently.

82.

Defendant MATTOX stated that she was only told that Jessica took some methamphetamine.

83.

Defendant MATTOX stated that before she left for home, she gave staff orders that if Jessica had any more seizures to put her in the safety helmet to prevent her from hurting herself.

84.

Defendant MATTOX stated that when Defendant MACKEY called her about Jessica taking meth, she told them to monitor Jessica's vitals every hour and check on her every fifteen minutes.

85.

Defendant MATTOX stated that every time they checked Jessica's vitals, they were normal.

86.

SAS Lampley obtained a recorded statement from Defendant GASPARD, who stated that the first time she realized that Jessica had a seizure was when he and Defendant HARRY saw Jessica from the camera inside her cell.

87.

Defendant GASPARD stated that she and Defendant HARRY knew how to deal with Jessica because she had been there several times, and she had a history of seizures.

88.

Defendant GASPARD stated that she and Defendant HARRY talked to and calmed Jessica, and Defendant GASPARD stated that she retrieved the safety helmet for Jessica's head because she was erratically jerking.

89.

Defendant GASPARD stated that she and Defendant HARRY put Jessica back in bed wearing the safety helmet, checked her blood pressure and vitals, then returned to central office.

90.

Defendant GASPARD stated that she and Defendant HARRY continued to monitor Jessica from the camera as they performed their rounds.

91.

Defendant GASPARD stated that a few hours later she and Defendant HARRY observed Jessica having another seizure and stated that she and Defendant HARRY returned to Jessica's cell and were told by Jessica that she took drugs that she had hidden inside her vagina.

92.

Defendant GASPARD stated that she could not understand if Jessica said a gram or eight grams of meth.

93.

Defendant GASPARD stated Defendant HARRY notified central office of what Jessica told them about ingesting meth.

94.

Defendant GASPARD stated that Defendant MACKEY, at central office, tried calling the on-call nurse, Defendant MATTOX, four times and could not reach her.

95.

Defendant GASPARD stated Defendant MACKEY then called Defendant STRICKLAND and was told to put Jessica in the safety chair and safety helmet because of her history of seizures.

96.

Defendant GASPARD stated she and Defendant HARRY placed Jessica in the safety chair and safety helmet then returned to central office and continued to monitor Jessica from the camera.

97.

Defendant GASPARD stated that was all the interaction she had with Jessica before getting off work.

98.

SAS Lampley obtained a recorded statement from Defendant MACKEY, who stated that her interaction with Jessica was only when she checked Jessica's vitals, which were normal.

99.

Defendant MACKEY stated that Jessica's only concern was how she could get out of jail, and that Jessica asked how she could get placed back in general population, and Defendant MACKEY explained to Jessica that the nursing protocol was that she had to detox from her current substance for a few days and not have any seizures.

100.

Defendant MACKEY stated that her second interaction with Jessica was during mealtime, when she asked Jessica, "Did you take any drugs?" and she replied, "Yes."

16

101.

Defendant MACKEY stated that she asked Jessica, "How were you able to take drugs in jail?" and she replied that she had the drugs hidden inside her vagina.

102.

Defendant MACKEY stated she explained to Jessica that she could get new charges, and that Jessica then completely stopped talking and would not answer any more questions.

103.

Defendant MACKEY stated that Jessica said she took eight grams of meth because she did not want to hurt any more, and that she told Jessica that was the wrong way to handle things.

104.

Defendant MACKEY stated she explained to Jessica that the jail staff would continue to monitor her by checking her and her vitals every fifteen minutes.

105.

Defendant MACKEY stated that she tried calling the on-call nurse several times with no answer, so she called Defendant STRICKLAND.

106.

Defendant MACKEY stated that Defendant STRICKLAND advised her that since she did not see anything related to Jessica taking drugs to just monitor her while still wearing the safety helmet and receiving checks every fifteen minutes including her vitals.

107.

SAS Lampley obtained a recorded statement from Defendant HARRY, who stated that the first time he went to Jessica's cell was when Defendant HARRY realized from the camera inside Jessica's cell that she was having a seizure.

108.

Defendant HARRY stated he went to Jessica's cell to assist her and stated that he called Defendant MATTOX about Jessica having a seizure.

109.

Defendant HARRY stated he was informed to place a safety helmet on Jessica to prevent her from hurting herself.

110.

Defendant HARRY stated that later that day, he realized that Jessica was on the floor kicking the door and stated that he and Defendant GASPARD went to Jessica's cell to see what was going on.

111.

Defendant HARRY stated that Jessica informed him and Defendant GASPARD that she took eight grams of meth she had hidden inside her vagina.

112.

Defendant HARRY stated that he radioed Defendant MACKEY in central office to have her call Defendant MATTOX, and that Defendant MACKEY tried calling Defendant MATTOX four times with no answer.

113.

Defendant HARRY stated that Defendant MACKEY then called Defendant STRICKLAND, who advised Defendants HARRY and GASPARD to place Jessica in the safety chair and safety helmet and to check her and her vitals every fifteen minutes.

114.

Defendant HARRY stated that he explained to Jessica that he and Defendant GASPARD would be checking on her every fifteen minutes, and that he and Defendant GASPARD then returned to the central office.

115.

Defendant HARRY stated that Defendant MATTOX finally called Defendant MACKEY back, and that Defendant MATTOX stated that they should place Jessica in a safety helmet, put her in the safety chair, and to check on her and her vitals every fifteen to thirty minutes.

116.

Defendant HARRY stated that he and Defendant MACKEY returned to Jessica's cell, because he and Defendant MACKEY could see from the camera that the straps on Jessica's legs were loose.

117.

Defendant HARRY stated Defendant MACKEY proceeded to talk to Jessica about the drugs she had taken, and to inform her that she could get a new charge.

118.

Defendant HARRY stated Jessica stopped talking to Defendant MACKEY, and that he proceeded to check Jessica's cell searching for drugs, and no drugs were found.

119.

Defendant HARRY stated that he got off work at approximately 6:03 pm, but before leaving he zoomed the camera in on Jessica so the night shift could see her face up close.

120.

Defendant HARRY stated that when he got off work Jessica was awake and moving around in the safety chair.

121.

SAS Lampley obtained a recorded statement from Defendant CARSON, who stated that on Saturday, November 25, 2023, at approximately 4:00 am, she entered Jessica's cell to give her some breakfast.

122.

Defendant CARSON stated she placed the tray on a table because Jessica was still in bed, and at approximately 4:55 am, she returned to Jessica's cell to retrieve the breakfast tray.

123.

Defendant CARSON stated that she got off work that morning and returned later that evening to work another shift.

124.

Defendant CARSON stated that upon her return to work, she was informed that Jessica was in a safety chair and needed to be taken out at 6:30 pm.

125.

Defendant CARSON stated that she was told that the reason Jessica was in a safety chair was because she had told jail staff that she took eight grams of meth that she had hidden inside of her vagina.

126.

Defendant CARSON stated that she was told that Jessica needed to be checked every fifteen to thirty minutes, including a check of her vitals.

20

127.

Defendant CARSON stated that at approximately 6:20 pm, she and Defendant BOLT went to Jessica's cell to remove her from the safety chair.

128.

Defendant CARSON stated that when Defendant BOLT opened the cell, called Jessica's name several times, and heard no response from her.

129.

Defendant CARSON stated that she then radioed central office to inform them that Jessica was not breathing and to call 911.

130.

Defendant CARSON stated that since she was not CPR certified, she called Defendant STRICKLAND.

131.

Defendant CARSON stated that once she noticed white drool coming from Jessica's mouth, she took off the safety helmet, arm, and leg straps as Defendant BOLT continued to do chest compressions on Jessica.

132.

Defendant CARSON stated, while on the phone Defendant STRICKLAND, she and Defendant BOLT placed Jessica on the floor, after which Defendant STRICKLAND told Defendants BOLT and CARSON to retrieve the AED.

133.

Defendant CARSON stated that she ran and retrieved the AED from the medical room, with Defendant STRICKLAND still on the phone, who explained how to properly use the AED on Jessica.

134.

Defendant CARSON stated that Defendant BOLT continued to apply chest compressions while she was trying to figure out how to use the AED.

135.

Defendant CARSON stated that Deputy Elliot arrived at Jessica's cell and took over chest compressions until paramedics arrived on the scene and transported Jessica to the hospital.

136.

SAS Lampley obtained a recorded statement from Defendant BOLT, on Wednesday, December 6, 2023, at approximately 1:27 pm.

137.

Defendant BOLT stated that her only interaction with Jessica was when Defendant BOLT and Defendant CARSON found Jessica unresponsive inside her cell sitting in the safety chair.

138.

Defendant BOLT stated that at approximately 6:27 pm, she opened Jessica's cell and after yelling her name several times with no response, found her unresponsive.

139.

Defendant BOLT stated she then asked Defendant CARSON to call central office and have them call 911.

140.

Defendant BOLT stated that she rushed to Jessica to check her pulse, then told Defendant CARSON to call Defendant STRICKLAND.

141.

Defendant BOLT stated that she and Defendant CARSON panicked.

142.

Defendant BOLT stated that she started chest compressions while Defendant CARSON removed the straps from Jessica's arms and legs.

143.

Defendant BOLT stated that once the straps were removed, she and Defendant CARSON placed Jessica on the floor and continued with chest compressions.

144.

Defendant BOLT stated that Defendant STRICKLAND advised Defendant BOLT and Defendant CARSON to retrieve the AED.

145.

Defendant BOLT stated as Defendant STRICKLAND was still on the phone, she retrieved the AED but did not know how to use it.

146.

Defendant BOLT stated that Defendant STRICKLAND walked her through how to place the pads on Jessica.

147.

Defendant BOLT stated that she placed one pad on the front of Jessica and the other on the back, but the AED would never shock her, so Defendant CARSON continued with chest compressions.

148.

Defendant BOLT stated that she called Defendant MATTOX to ask where the Narcan was located.

149.

Defendant BOLT stated Defendant MATTOX told her that the Narcan was in the red medical bag.

150.

Defendant BOLT stated she ran to the medical room, searched for the medical bag and looked for the Narcan (which she didn't initially recognize because it was labeled Naloxone).

151.

Defendant BOLT stated that she ran back to Jessica's cell to let Defendant CARSON know she could not find the Narcan.

152.

Defendant BOLT stated that she relieved Defendant CARSON of chest compressions.

153.

Defendant BOLT stated Deputy Elliot arrived at Jessica's cell and took over chest compressions.

154.

Defendant BOLT stated Deputy Elliot told her to open the doors for the paramedics to get inside.

155.

SAS Lampley obtained a typed statement from Deputy Elliott

156.

Deputy Elliot stated that on Saturday, November 25, 2023, at approximately 6:00 pm he was dispatched to Randolph County Jail in reference to an inmate who was unresponsive with CPR in progress.

157.

Deputy Elliot stated that while in route, Defendant STRICKLAND called and advised who the inmate was and advised that the AED was deployed by jail staff.

158.

Deputy Elliot stated that upon arrival, he entered the jail through the sally port entrance and entered the holding area where he observed jail staff performing CPR on Jessica.

159.

Deputy Elliot stated that he took over chest compressions until he advised to stop by the AED device.

160.

Deputy Elliot stated that the AED advised no shock and Deputy Elliott started chest compressions again.

161.

Deputy Elliot stated that Southern Ambulance Transport arrived, attached a monitor, and intubated Jessica.

162.

Deputy Elliot stated Southern Ambulance Transport loaded Jessica onto a back board and transported her out of the cell and into the ambulance.

163.

Deputy Elliot stated Jessica was transported to Tanner Medical Center/East.

164.

SAS Lampley obtained a typed statement from Randolph County Jail Maintenance Supervisor Ken Treadwell.

165.

Supervisor Treadwell stated on Monday, November 27, 2023, at approximately 2:00 pm he was asked by Randolph County Jail Corrections Lieutenant Jim Studdard to check the "catch tank" for a small Tylenol bottle.

166.

Supervisor Treadwell stated the catch tank had been pumped out on Monday, November 22, 2023.

167.

Supervisor Treadwell stated that he went and pulled the lid and found a Tylenol bottle fitting the description given to him.

168.

Supervisor Treadwell stated that upon retravel, he then took said bottle to Lieutenant Studdard and gave it to him.

169.

SAS Lampley obtained a typed statement from Randolph County Investigator Michael Harris.

170.

Investigator Harris stated that on Saturday, November 25, 2023, he was contacted by Deputy Elliot to advise him of a dispatch to Randolph County Jail in reference to an unresponsive female, Jessica, with CPR in progress.

171.

Investigator Harris stated that while on the route he was notified that Southern Ambulance Transport would be transporting Jessica to Tanner Medical Center/East.

172.

Investigator Harris stated that he traveled to the hospital.

173.

Investigator Harris stated that upon arrival at the hospital, Jessica was believed to be deceased, and that Randolph County Coroner Terry Sparks was notified.

174.

On Tuesday, December 19, 2023, at approximately 11:10 am, SAS Lampley spoke to Attorney Keith Warren who stated that his client, Defendant STRICKLAND, was not on the scene when this incident happened; therefore, he would not be giving any statement.

175.

Tanner Medical Center medical records for Jessica reflected that on Saturday, November 25, 2023, at approximately 7:14 pm, Rakesh R Shan, M D. treated Jessica.

176.

At approximately 7:47 pm, Doctor Shan pronounced Jessica time of death.

177.

On Friday, December 1, 2023, an autopsy examination was performed on Jessica. See, *Report of Autopsy*, attached as **Exhibit 4**.

178.

The autopsy report determined that the cause of death was a combination of fentanyl, chlordiazepoxide, and methamphetamine toxicity. *Id.*, Page 1.

179.

The autopsy report also documented that Jessica had a history of illicit drug use and drug-related seizures. *Id.*

180.

Jessica was arrested and taken to the Randolph County Jail on November 21, 2023, with charges that included three counts of possession of controlled substances, specifically MDMA (an abbreviation of 3, 4-methylendioxymethaphetamine).

181.

Based on information and belief, Jessica was known and familiar to staff at the Randolph County Jail, including the individual Defendants, who were aware of her history of drug use and addiction.

182.

Dr. Peter Akpunonu, conducted a review of the Alabama SBI's Report of its investigation and findings into Jessica's death and has rendered the following preliminary expert medical opinions regarding the relevant standard of care, timeline of response, toxicology interpretation, and institutional practices of the Randolph County Jail. See *Expert Affidavit*, attached hereto as **Exhibit 5**, and *Curriculum Vitae*, Peter Akpunonu MD, FAAEM, FACEP, FACMT, attached hereto as **Exhibit 6**.

183.

Among the preliminary opinions of Dr. Akpunonu, is an opinion regarding the relevant standard of care:

> The accepted standard of care supported by ACEP, ACMT, and NCCHC requires immediate EMS activation upon disclosure of a potentially lethal drug ingestion, particularly a stimulant such as methamphetamine. Ms. Jordan disclosed ingestion of approximately eight grams (RCJ_000012), a quantity within or exceeding reported lethal ranges. Her subsequent agitation and seizure-like activity (RCJ_000014) necessitated emergent medical evaluation. Despite this, she was kept in the jail, placed in a safety chair (RCJ_000017), and monitored primarily by correctional staff. The decision not to activate EMS until after she was pulseless (6:27 PM) fell below the standard of care.

*Exhibit 4 Expert Affidavit, Page 3.*

184.

Dr. Akpunonu reached the following preliminary opinion regarding the Randolph County Jail's institutional practices, identifying "systemic issues [that] contributed to delayed care" of Jessica, as follows:

> Based on review of officer interviews and jail protocols, significant institutional deficiencies were identified: (1) No functional overdose response protocol; (2) Inadequate training in naloxone recognition; (3) No requirement for

immediate EMS activation for reported ingestion; (4)  and Communication lapses between staff and the on-call nurse.

*Expert Affidavit, Page 4.*

185.

Based on his review of the autopsy toxicology, Dr. Akpunonu concluded that the mechanism of Jessica's death was "consistent with sympathomimetic toxicity progressing to cardiac arrest" that is consistent with Jessica ingesting an "acute high dose" of meth resulting in "[p]redictable progression to seizure, hyperthermia, arrhythmia, and cardiac arrest." *Expert Affidavit, Page 3.*

186.

Dr. Akpunonu concluded that in his professional opinion to a reasonable degree of medical and toxicological certainty that "Ms. Jordan's death was medically foreseeable and potentially survivable with earlier intervention" and "[d]elays in activating EMS, reliance on physical restraint, and inadequate institutional protocols represent substantial deviations from accepted medical and correctional standards." *Expert Affidavit Page 4.*

187.

Based on the facts described herein, including the expert medical opinions of Dr. Akpunonu, Defendant MATTOX acted with deliberate indifference and contrary to the applicable standard of care, by not timely instructing that Jessica be taken to the hospital or otherwise taking appropriate action, when she became aware that Jessica had ingested a large amount of methamphetamine.

188.

Based on the facts described herein each of the individual Defendants acted with deliberate indifference by not transporting Jessica to the hospital or otherwise taking appropriate action when they became aware that Jessica had ingested a large amount of methamphetamine.

189.

At all times relevant hereto, Defendant SHP was under contract with the Randolph County Jail to serve as its managing health provider responsible for providing comprehensive medical services to inmates, and for developing and implementing policies and treatment protocols impacting inmates in the jail.

190.

The failure of Defendants to transport Jessica to the hospital or otherwise take appropriate action when they became aware that Jessica ingested a large amount of methamphetamine, was the direct and proximate cause of Jessica's death.

**COUNT ONE**

**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT VIOLATION**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**

**(Individual Defendants)**

191.

The factual allegations contained in Paragraphs 1 through 190 are incorporated into this paragraph as if expressly set forth herein.

192.

Deliberate indifference to a pre-trial detainee's serious medical needs is a violation of the Fourteenth Amendment's Due Process Clause, based on a showing that the plaintiff had an

objectively serious medical need, that if left unattended, poses a substantial risk of serious harm, and that the defendant acted with deliberate indifference to that need.

193.

The individual Defendants were aware from their training and experience, that, due to the risk of death, a person who has ingested a large quantity of meth requires evaluation and treatment at a hospital.

194.

The facts described herein show that the individual Defendants were subjectively aware that their conduct put Jessica at substantial risk of serious harm by not transporting her to the hospital, and by disregarding this risk their conduct was reckless and constitutes deliberate indifference to Jessica's serious medical needs in violation of the Fourth Amendment's Due Process Clause.

195.

The individual Defendants are not entitled to qualified immunity because their conduct was intentional and showed a reckless disregard for Jessica's clearly established rights under the Fourteenth Amendment to the United States Constitution of which a reasonable person would have known.

196.

The deliberate indifference of the individual Defendants was a proximate result of Jessica's death, which entitles Plaintiff to recover compensatory damages for Jessica's injuries and wrongful death.

## COUNT TWO:

## <u>ALABAMA STATE LAW NEGLIGENCE CLAIM AGAINST DEFENDANT HEATHER LYNN MATTOX</u>

197.

The factual allegations contained in Paragraphs 1 through 196 are incorporated into this paragraph as if expressly set forth herein.

198.

Defendant MATTOX, as a licensed and trained LPN, knew or should have known that due to the risk of death, a person who has ingested a large quantity of meth requires evaluation and treatment at a hospital even without accompanying signs and symptoms.

199.

Although Defendants MACKEY, HARRY and GASPARD reported that they informed Defendant MATTOX that Jessica had ingested eight grams of meth, Defendant MATTOX claims that no one ever told her that Jessica had taken eight grams of methamphetamine otherwise she would have handled the situation differently.

200.

The treatment and care provided to Jessica under the direction of Defendant MATTOX fell below the standard of care applicable to the medical profession generally, and similarly situated healthcare providers, including but not limited to the standard of care applicable to nurses and other primary care providers in a correctional setting, under the circumstances and conditions then existing.

201.

Defendant MATTOX deviated from the applicable standard of care in the following manner: (a) by failing to examine and properly assess Jessica when she was informed that Jessica had

injected a large quantity of meth; (b) by failing to instruct Randolph County Jaill staff to transport Jessica to the hospital for evaluation and treatment; and (c) by otherwise failing to exercise that degree of care that a reasonable nurse or comparable care provider would have exercised under like or similar circumstances.

202.

The above-described deviations and violations of the applicable standard of care by Defendant MATTOX, operating separately and in combination with the other individual Defendants, constitute professional negligence and nursing malpractice for which Defendant MATTOX is individually liable.

203.

The negligence of Defendant MATTOX was a proximate result of Jessica's death, which entitles Plaintiff to recover compensatory damages against Defendant MATTOX for Jessica's injuries and wrongful death.

## COUNT THREE

## ALABAMA STATE LAW VICARIOUS LIABILITY OF DEFENDANT SOUTHERN HEALTH PARTNERS, INC.

204.

The factual allegations contained in Paragraphs 1 through 203 are incorporated into this paragraph as if expressly set forth herein.

205.

Under Alabama law, an employer is liable for the negligent acts of its employees that are committed within the course and scope of their employment, based on the doctrine of *respondeat superior*.

206.

Because the above-referenced professional negligence and malpractice of Defendant MATTOX was committed while she was acting within the scope of her employment with Defendant SHP, the doctrine of *respondeat superior* applies and Defendant SHP is liable for said professional negligence and malpractice of Defendant MATTOX for all damages allowed under Alabama law.

## COUNT FOUR

## ALABAMA STATE LAW BREACH OF CONTRACT BY DEFENDANT SOUTHERN HEALTH PARTNERS, INC.

207.

The factual allegations contained in Paragraphs 1 through 206 are incorporated into this paragraph as if expressly set forth herein.

208.

Defendant SHP is a for-profit corporation that had contractual duties to provide medical care for inmates in the Randolph County Jail commencing with the booking and physical placement of inmates into the jail.

209.

Defendant SHP's contractual duty includes providing and arranging for inmates to receive professional medical and related health care to include emergency medical care, and emergency ambulance services when medically necessary.

210.

Defendant SHP's contractual duty includes responsibility for providing and/or arranging for all medical treatment and health care services to inmates of the Randolph County Jail regardless

of the nature of the illness or injury or whether the illness or injury occurred prior or after the individual's incarceration.

211.

Defendant SHP's contractual duties include providing professional medical and support personnel, such as Defendant MATTOX, who are reasonably necessary for the rendering of health services to inmates at the Randolph County Jail.

212.

Defendant SHP's contractual duties include screening inmates for drug and alcohol intoxication including inmates that are experiencing withdrawal and decompensating behavior.

213.

Jessica, as an inmate at Randolph County jail, was an intended third-party beneficiary of Defendant SHP's contractual duties as described above.

214.

Defendant SHP, by and through the actions and omissions of Defendant MATTOX, breached its contractual obligations to provide medical care to inmates at the Randoph County Jail.

215.

Defendant SHP's breach of this contract proximately caused Jessica's meth overdose to go untreated until she was found unresponsive, having experienced physical injury, pain, suffering, and eventually death, resulting in the liability of Defendant SHP to Plaintiff for all damages allowed under Alabama law.

WHEREFORE, Plaintiff respectfully requests the following relief:

      (a)    That Plaintiff be awarded costs, including but not limited to reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

(b)    That the Court award Plaintiff compensatory, punitive, and/or nominal damages against Defendants in an amount to be determined by the enlightened conscience of an impartial jury;

(c)    That the Court grant Plaintiff her reasonable costs and attorney's fees in bringing this action in an amount to be determined at trial;

(d)    That Plaintiff be granted a trial by jury on all issues so triable; and

(e)    The Plaintiff be granted such other and further relief as this Court deems just and proper.

Respectfully submitted, this 24th day of November, 2025.

KEVIN A. ADAMSON, P.C.

*s/ Vincent J. Van Deventer*
Vincent J. Van Deventer
Alabama Bar. No. 1056X39D
3700 Crestwood Parkway Northwest
Suite 600
Duluth, Georgia 30096
T: (404) 581-9100
F: (404) 581-9111
Email: vincent@kaapc.com
*Attorney for Plaintiff*